UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:17-cr-00029-RLY-MPB |
| | ) | |
| FREDDIE DEMARKA REED, III, (1) | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S SECOND MOTION TO SUPPRESS**

This case stems from a warrantless search of an automobile. On June 13, 2017, law enforcement officers pulled over a vehicle in which Defendant was a passenger to arrest him on an outstanding warrant for violating his parole. The officers then searched the vehicle and found two firearms near where Defendant was seated. Because the government has not carried its burden of showing that an exception to the general warrant requirement applies, the search violated Defendant's Fourth Amendment rights. Accordingly, Defendant's motion to suppress will be **GRANTED**.

**I.     Background**

    **A.     Facts[1]**

On Friday, March 10, 2017, Katie Hawkins and Breea Galiher traveled from Illinois to Evansville, Indiana to meet up with Defendant and spend the evening gambling at a local casino. However, their luck ran out by the end of the night: Galiher got a flat

---

[1] The facts are taken from trial testimony.

1

tire that prevented them from returning home. They could not change the tire because the rim had a locking lug nut, and Galiher left the key back in Illinois. They ended up staying the rest of Friday and Saturday at Defendant's house, though Defendant apparently stayed elsewhere.

On Sunday, they returned to the casino with Defendant and gambled overnight. On Monday morning, Defendant and Galiher left the casino in a white Nissan Pathfinder to find a can of Fix-A-Flat, hoping to repair Galiher's flat tire. The Pathfinder was owned by Jessica Jackson, who was the mother of Defendant's child, but she frequently let Defendant use it. They first stopped at Defendant's residence, where he was confronted by Jackson, who was upset because he was with another woman. After the two had an argument, Defendant left with Galiher to resume their mission of finding a solution to the flat tire.

However, they did not get very far. Shortly after they left the house, officers with the Evansville Police Department ("EPD") pulled them over.[2] Before they came to a complete stop, Defendant attempted to hand Galiher a gun to hide. She rejected his request. Once stopped, Galiher and Defendant exited the vehicle. Galiher told the officers Defendant had attempted to hand her a gun, and it was still in the vehicle. The officers searched the vehicle but did not find anything. They subsequently released Defendant and Galiher without making an arrest.

---

[2] The motivation for the traffic stop is not quite clear, but Galiher testified that the police were investigating the earlier argument between Defendant and Jackson.

Jackson arrived to the scene of the traffic stop to get her vehicle, and then drove Galiher back to the casino to pick up Hawkins. The three of them subsequently returned to Defendant's house. Meanwhile, an unidentified woman picked up Defendant from the traffic stop, and the two of them went to a nearby restaurant. At some point later in the morning, the unidentified woman dropped Defendant off at his house.

To briefly reset the scene: it is late Monday morning, and Defendant, Galiher, Hawkins, and Jackson are now at Defendant's house. Realizing that Hawkins and Galiher needed to get back to Illinois, Jackson permitted them to use her vehicle. Defendant also joined because he needed a ride to a nearby house, and Hawkins said she could drop him off on the way. The three of them exited the house and entered the Pathfinder: Hawkins as the driver, Galiher as the front-seat passenger, and Defendant as the rear-seat passenger. Hawkins then drove away from the residence. Unbeknownst to them, at this time, Task Force Officers from the United States Marshal's Fugitive Task Force were surveilling the residence because Defendant had an outstanding warrant based on a parole violation.

Hawkins only made it a few blocks before the officers conducted a traffic stop. Task Force Officer Brian Bishop initiated the stop. He was joined by Troopers Michael Finney and Justin Bean of the Indiana State Police, Detective Sergeant Kurt Althoff of the Vanderburgh County Sheriff's Office, Deputy U.S. Marshal Chris Baldelli, and Deputy U.S. Marshal Jon Albright. Trooper Finney testified that this stop was a felony stop, which is a tactical stop officers use when there is a higher potential of risk to officer safety. In such a scenario, the officers position their vehicles in a manner where, if

3

needed, they can be used as cover. With their firearms drawn,[3] the officers ordered Hawkins, Galiher, and Defendant out of the vehicle. All three were detained without incident.

Trooper Finney and Officer Bishop began searching the vehicle immediately. Trooper Finney testified that he did not speak to any of the occupants of the vehicle before conducting the search, and he had not been briefed by any other officer. Ultimately, Trooper Finney found two firearms located in a compartment under the middle seat, in the rear of the vehicle. At that point, the officers contacted Task Force Officers Joshua Patterson, who is a narcotics detective for Vanderburgh County Sheriff's Office, and Douglas Francis, who is an Indiana State Trooper assigned to assist ATF, to come to the scene and further investigate. TFO Patterson arrived to the scene and began taking photographs and collecting evidence. TFO Francis arrived and interviewed Galiher and Hawkins. TFO Francis then drove to the Vanderburgh County Sheriff Department's Command Post, where Defendant had been transported, and interviewed Defendant. During the interview, Defendant admitted to possessing the two firearms.

### B. Procedure

On June 29, 2017, Defendant was indicted on one count of unlawful possession of a firearm. (Filing No. 1). On August 23, 2017, he filed his first motion to suppress. (Filing No. 19). The government responded on August 31, 2017, and on October 17, 2017, the court conducted a suppression hearing. (Filing Nos. 20 and 25).

---

[3] Trooper Finney testified that during a felony stop, it is common for officers to have their guns drawn.

At the suppression hearing, Sergeant Althoff testified for the government.[4] With respect to the timing of the search of the vehicle, Sergeant Althoff testified that the officers talked to Hawkins and Galiher *before* the officers searched the vehicle. (Suppression Hr'g Tr. at 20:9 – 13). The following exchange took place between the government and Sergeant Althoff:

> Q: When you spoke to [Hawkins and Galiher], were they -- were they willing to speak with you?
>
> A: They were. They were cooperative.
>
> Q: And what did you learn when you spoke to them?
>
> A: Well, we asked them what was going on during the stop because as I mentioned before, I was in the very back but we had radio contact with everybody, and they were saying that [Defendant] was moving all around in the back seat. So we kind of talked to them about that, what was going on; and as I mentioned, the girls were very cooperative. They said that during the stop, Mr. Reed was trying to have them stash items or hide items.

(*Id.* at 30:2 – 12). The "items," Sergeant Althoff explained, were two methamphetamine pipes, a bag of marijuana, and a handgun. (*Id.* at 30:16 – 25). Sergeant Althoff reiterated that the search occurred after the conversation with Hawkins and Galiher:

> Q: When you learned this information from these two passengers, had a search of the vehicle been conducted yet?
>
> A: No.

---

[4] Technically, Defendant called Sergeant Althoff, and he was listed as "Defendant's witness." (Filing No. 59, Transcript of Suppression Hearing ("Suppression Hr'g Tr.") at 13:22 – 23; 14:1 – 2). However, "a law enforcement officer is considered a government witness" at a suppression hearing. Fed. R. Crim. P. 12(h).

(*Id.* at 31:7 – 9). Based on Sergeant Althoff's testimony, the court denied Defendant's motion to suppress. (*See* Filing No. 28, Order Denying Motion to Suppress). The court found that the officers had probable cause to search the vehicle:

> Officer Althoff testified that Defendant's parole agent advised officers, prior to the arrest, that Defendant was known to carry firearms. After talking with Hawkins and Galiher, the officers were aware that Defendant had attempted to conceal methamphetamine pipes and marijuana, both of which were found, and also a firearm, which had not yet been located. The officers were mindful too of Defendant's suspicious movements while the vehicle was being pulled over. Armed with all of this knowledge, the officers had enough information to believe that a firearm would be found in the vehicle.

(*Id.* at 6).

With his motion to suppress denied and having failed to reach a plea agreement with the government, on March 12, 2018, Defendant proceeded to trial. After testimony from three of the government's witnesses (Hawkins, Jackson, and Galiher), Defendant renewed his motion to suppress. (*See* Filing No. 57, Transcript of Jury Trial – Day 1 ("Day 1 Tr.") at 219 – 222). The court took the motion under advisement and proceeded with evidence. (*Id.* at 222). For reasons not important here, the trial ultimately ended in a mistrial. (*See* Filing No. 47).

On March 29, 2018, Defendant filed a second motion to suppress—the present motion before the court. (Filing No. 52). On April 4, 2018, the government responded. (Filing No. 54).

## II. Discussion

Before going forward, the court must first address a procedural hurdle: the consideration of a second motion to suppress having already denied Defendant's first

6

one. With this out of the way, the court then turns to the parties' arguments on the legality of the search.

### A. The court can consider the second motion to suppress

Ordinarily, a court should not reconsider issues already decided earlier in the litigation. *In re Mathias*, 867 F.3d 727, 730 (7th Cir. 2017); *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1240 (10th Cir. 2016) (Gorsuch, J.) ("Law of the case doctrine permits a court to decline the invitation to reconsider issues already resolved earlier in the life of a litigation."). However, an exception lies where there has been a change in circumstances—such as where the testimony at trial differs significantly from the testimony at a suppression hearing. *E.g. United States v. Montos*, 421 F.2d 215, 220 (5th Cir. 1970) (citations omitted) ("If new facts come to light at trial, the trial judge in the exercise of his discretion may consider anew the suppression issue.").

The trial testimony casts doubt on Sergeant Althoff's testimony at the suppression hearing. While Sergeant Althoff testified that the search occurred after officers talked with Hawkins and Galiher, other witnesses testified that the search occurred immediately. Trooper Finney, the officer who searched the vehicle and found the firearms, testified as follows:

> Q: Once individuals were removed from the vehicle, was a search of the vehicle then conducted shortly thereafter?
>
> A: Yes.
>
> . . . .
>
> Q: You approached the car -- a group of officers approached the car, stopped it with guns drawn, ordered the passengers out?

7

> A: That's the short version.
>
> . . . .
>
> Q: And then did you immediately start to search the car?
>
> A: After all the occupants were safely removed from the vehicle.

(Day 1 Tr. at 226:14 – 16; 230:16 – 19; 231:1 – 3). Trooper Bean's and Galiher's testimony also discredits Sergeant Althoff's version. (*Id.* at 244:5 – 7) ("Q: [Trooper Bean] When did you learn that the firearms had been located? A: Pretty much immediately after all the subjects were out of the vehicle."); (*Id.* at 215:2 – 9) (Galiher testifying that she thinks the car was searched right away).

Sergeant Althoff also testified that Galiher and Hawkins informed officers about items Defendant had sought to hide *prior to* the search of the vehicle. (Suppression Hr'g Tr. at 31:7 – 9; 33:10 – 12). He testified that an inventory search needed to be done prior to towing the vehicle because the registered owner was not there. (*See id.* at 33:19 – 21). However, Sergeant Althoff's testimony directly conflicts with Trooper Finney's testimony:

> Q: And you didn't speak to either Breea Galiher or Katie Hawkins before you conducted your search?
>
> A: I didn't speak to any of the occupants of the vehicle.
>
> Q: Did anybody tell you anything that Breea Galiher had said or that Katie Hawkins had said before you started your search?
>
> A: No.
>
> Q: Did this search have anything to do with an inventory preparatory to towing the vehicle?

8

> A: No.
>
> . . . .
>
> Q: Nobody told you anything anybody else had said or done that led you to conduct that search?
>
> A: We had information that this was -- the subject may be armed and there was a higher potential of a gun present. And so when we had everybody out of the vehicle and there was no weapon found on anyone, that's what we had in our mind is we were looking for weapons.

(Day 1 Tr. at 234:22 – 25; 235:1 – 5; 236:23 – 25; 237:1 – 4).

That is not to say Sergeant Althoff was not telling the truth. However, in light of the testimony presented at trial, Sergeant Althoff's testimony is simply not credible.[5] Accordingly, the court finds that the testimony elicited at trial constitutes a change in circumstances, and therefore, it is proper to reconsider the suppression issue. *See Arizona v. California*, 460 U.S. 605, 618 n. 8 (1983) (citation omitted) (noting it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice); *Montos*, 421 F.2d at 220.

### B. The search violated Defendant's Fourth Amendment rights

The Fourth Amendment guards against unreasonable searches and seizures. U.S. Const. Amend. IV. Searches conducted without a warrant are *per se* unreasonable, unless a well-delineated exception applies. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). Defendants initially bear the burden of

---

[5] The court notes that Sergeant Althoff did not testify at trial, and thus, could not explain some of these inconsistencies.

showing their rights have been violated. *United States v. Evans*, 27 F.3d 1219, 1228 (7th Cir. 1994). However, where, as here, the search is conducted without a warrant, the burden shifts to the government to show by a preponderance of the evidence that an exception to the warrant requirement applies. *United States v. Longmire*, 761 F. 2d 411, 417 (7th Cir. 1985) (citations omitted). The government offers two justifications for the search: the automobile exception and a proper inventory search. Neither is persuasive.

### 1. Trooper Finney did not have probable cause, and so the automobile exception does not apply

One of the exceptions to the warrant requirement is the automobile exception. *See Carroll v. United States*, 267 U.S. 132, 153 – 56 (1925). Under the automobile exception, law enforcement may search a vehicle without a warrant "if there is probable cause to believe the vehicle contains contraband or evidence of a crime." *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010) (citations omitted). Probable cause is a nontechnical, fluid concept that exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (citations omitted); *Williams*, 627 F.3d at 251. The automobile exception is not keyed to the offense of arrest, meaning that officers can arrest a motorist for one crime, and search the automobile based on probable cause for a completely unrelated crime. *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014).

The court previously found that the officers had probable cause, in part, because Sergeant Althoff testified that Galiher and Hawkins had informed the officers that

10

Defendant had attempted to conceal contraband and a firearm *before* the search of the vehicle.

But the trial testimony tells a different story. Trooper Finney testified that he did not talk to either Galiher or Hawkins before searching the vehicle. (Day 1 Tr. at 234:22 – 24). Hawkins and Galiher both testified that they did not know anything about methamphetamine located in the vehicle. (*Id.* at 172:14 – 16; 214:3 – 7). Hawkins turned over the methamphetamine pipe and marijuana within 15 minutes of talking with officers—not immediately. (*Id.* at 173:8 – 15). Moreover, Galiher told law enforcement about Defendant handing her a firearm during *the first traffic stop*—when the vehicle was searched by EPD and nothing was located—not during *the second traffic stop*—when the firearms were actually found by the task force officers. (*Id.* at 217:11 – 13) ("Q: Well, you said he was trying to hand you something. Was that the first time you were pulled over or the second? A: That was the first."). In fact, with respect to the second traffic stop, Galiher testified that she did not see Defendant put anything into the console or compartment. (*Id.* at 217:2 – 4). While Trooper Finney did testify that "the back seat passenger[] was doing some moving around contrary to the instructions that were being given" during the initial stages of the traffic stop, (*id.* at 224:21 – 23), he later admitted that he could not easily view the back seat passenger, (*id.* at 225:7 – 9). He also admitted that he was not acting on the basis of any information imparted to him by another officer. (*Id.* at 236:19 – 22).

So the probable cause equation has changed. On the government's best day, all that Trooper Finney had was reason to believe that Defendant might be carrying

11

weapons, and all that he observed was movement in the backseat during the traffic stop. This is not enough to warrant a reasonable officer that evidence of a crime would be found in the vehicle. *Ornelas*, 517 U.S. at 696. While Trooper Finney's belief turned out to be correct, the constitutionality of searches does not rise or fall on whether incriminating evidence is ultimately found.

The government has not pointed to a single case where probable cause to search a vehicle was found in similar circumstances. In cases where probable cause has been found, the officers had more information than Trooper Finney. *E.g. United States v. Sands*, 815 F.3d 1057, 1063 (7th Cir. 2015) (officers had probable cause to search vehicle where confidential informant told law enforcement defendant had been selling drugs out of his vehicle, the officers observed a hand-to-hand drug transaction, and the searching officer observed defendant holding a firearm); *see also United States v. Nicksion*, 628 F.3d 368, 377 (7th Cir. 2010) (officers had probable cause to search defendant's vehicle when they observed defendant accept a $5,000 drug payment and engage in other drug transactions); *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (officers had probable cause to search vehicle after defendant, while carrying a shoebox, met suspected drug dealers at a stash house where a drug transaction had been observed by law enforcement the day before); *United States v. Zahursky*, 580 F.3d 515, 521 – 22 (7th Cir. 2009) (officers had probable cause to search vehicle that matched description described in prior online chats and that was driven by man who showed up to a designated location at a designated time).

The government argues that the information provided by Galiher and Hawkins is sufficient to constitute probable cause, but as already explained, Trooper Finney did not talk to them prior to the search. Accordingly, Trooper Finney did not have probable cause to search the vehicle, and the automobile exception does not apply.[6]

### 2. The search was not a valid inventory search

Another exception to the warrant requirement is an inventory search. *See South Dakota v. Opperman*, 428 U.S. 364, 374 – 76 (1976). The purpose of an inventory search is to inventory the vehicle's contents, not to rummage generally through a vehicle in order to discover incriminating evidence. *Florida v. Wells*, 495 U.S. 1, 4 (1990). "An inventory search is lawful if (1) the individual whose possession is to be searched has been lawfully arrested, and (2) the search is conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures." *United States v. Cartwright*, 630 F.3d 610, 614 (7th Cir. 2010) (citation omitted). While the Fourth Amendment's reasonableness analysis ordinarily does not encompass an officer's subjective motivations, *United States v. Edwards*, 769 F.3d 509, 516 (7th Cir. 2014) (collecting cases), a court can consider an officer's motivations when the justification is an inventory search. *See Whren v. United States*, 517 U.S. 806, 811

---

[6] The government has not argued, and so, the court has not considered whether the "collective knowledge" doctrine applies. *Williams*, 627 F.3d at 252 – 253. The court does note that in order for the doctrine to apply, the officer providing the information—in this case, the parole officer—must have facts supporting the suspicion—in this case, that Defendant was carrying a firearm. *Id.* at 252. There was no testimony by any parole officer, and the officers only testified that "they had received information." (Day 1 Tr. at 236:25, 237:1 – 4; 238:21 – 23). Perhaps this is enough, or perhaps not. Since the government has not pressed the collective knowledge doctrine, the court does not need to decide this issue.

(1996) (recognizing that subjective motivations may be taken into account for inventory searches); *Wells*, 495 U.S. at 4; *see Colorado v. Bertine*, 479 U.S. 367, 372 (1987) ("In the present case . . . there was no showing that the police, who were following standardized procedures, acted in bad faith or *for the sole purpose of investigation*.") (emphasis added).

Here, the search cannot be justified as an inventory search. First, the vehicle's owner, Jackson, and the authorized driver, Hawkins, were not arrested. In fact, Jackson showed up to the scene before the vehicle was towed away.[7] (Day 1 Tr. at 189:18 – 25; 190:1 – 2). Second, the officers deviated from Vanderburgh County towing policies and procedures. The Vanderburgh County Sheriff's towing policy provides:

> The Indiana Supreme Court has recognized a "Community Care Taking" provision to towing vehicles. To lawfully impound a vehicle under the community care-taking function the vehicle must pose a threat or harm to the community or itself [sic] was imperiled. Situations would include the vehicle being a traffic hazard or nuisance . . . an arrest of the driver would leave the vehicle unattended on a highway . . . an unattended vehicle would be exposed to theft, vandalism or otherwise would be a nuisance. **Proper articulation** will assist the courts to assess the reasonableness of the decision, that if left alone, the vehicle would be exposed to the risk of theft or vandalism.
>
> . . . .
>
> All vehicles towed/impounded at the direction of the Vanderburgh County Sheriff's Office shall be documented using the Indiana State form 4166 (R11/3-96) BMV form 322B. A standard crime/incident report associated with the appropriate law enforcement action taken should be completed on all vehicles towed or impounded.

---

[7] This might prompt the question of whether Defendant can even assert that his Fourth Amendment rights were violated since he neither owned nor drove the vehicle. The court will address this issue later.

14

(Filing No. 20-1, Vanderburgh County Sheriff's Office Towing and Impounding Policy ("Towing Policy")).

None of the situations listed apply: the vehicle was not a traffic hazard or a nuisance because it was legally parked on a side street (*See* Day 1 Tr. at 201:1 – 3, Gov't Ex. 4)[8]; the driver of the vehicle was not arrested; the vehicle was not on a highway; and the vehicle would not be exposed to theft because the owner—who was only a few blocks away—showed up to the location where it was parked. True, the list is not exhaustive, but the officers did not articulate another reason to tow the vehicle. Moreover, the Towing Policy requires officers to document the contents of the vehicle. There is no evidence of any completed forms or that an inventory was actually done. Simply put, the evidence shows that the officers did not comply with the Towing Policy. *Cf. Cartwright*, 630 F.3d at 614.

Noncompliance with the towing policy, though relevant, does not automatically render a search unreasonable. *Id.* The court still must consider the overall reasonableness of the search. *Id.*

The evidence shows that this was not a reasonable inventory search. In addition to failing to comply with the Towing Policy, Trooper Finney testified the search was *not* conducted as an inventory search, and he searched the vehicle to find weapons. This demonstrates the officers searched the vehicle because they believed they would find

---

[8] Government Exhibit 4 shows the Pathfinder parked on the side of the road next to a curb.

weapons, and therefore, any reliance on the search being an inventory search is merely pretext.

Though not binding on the court, the Eighth Circuit's decision in *United States v. Taylor*, 636 F.3d 461 (8th Cir. 2011) is persuasive. In *Taylor*, an officer pulled over Taylor for a traffic violation and subsequently arrested him for failing to produce an insurance card. *Id.* at 463. The officer suspected narcotics were in the vehicle because the officer had been informed that Taylor was involved with an illegal narcotics transaction. *Id.* Based on department policy, the officer decided to tow and search the vehicle. *Id.* After searching the vehicle, the officer found cocaine, along with hundreds of tools and several pieces of equipment. *Id.* When completing the tow-in report later, the officer wrote "misc. tools" instead of a detailed list of what was actually found. *Id.* The Eighth Circuit held that this inventory search was unreasonable. *Id.* at 465. The court explained that the officer failed to comply with department policy by writing "misc. tools" instead of documenting each tool and piece of equipment found. *Id.* at 464 – 65. Moreover, the court found that the inventory search was merely pretext because at the suppression hearing, the officer testified that the basis for the inventory search was her belief that the vehicle contained narcotics. *Id.* at 465.

Here, as in *Taylor*, the officers suspected evidence of a crime would be in the vehicle because of information relayed to them. Here, as in *Taylor*, the officers did not comply with the standardized inventory procedures—in fact, there is no evidence of *any* documentation of the vehicle's contents. Finally, here, as in *Taylor*, the searching officer testified he searched the vehicle because he believed that evidence of a crime (weapons)

16

would be found. Just as the Eighth Circuit did in *Taylor*, the court finds the search cannot be upheld as an inventory search.

### 3. Exclusion of the evidence is appropriate

Lastly, the government argues that the search was valid under the doctrine of inevitable discovery,[9] which permits the government to avoid the suppression of evidence notwithstanding an officer's unlawful conduct. *Cherry*, 436 F.3d at 772 (citations omitted); *see also Nix v. Williams*, 467 U.S. 431, 444 (1984). The burden is on the government to show by a preponderance of the evidence that the officers "'*would* have found the challenged evidence through lawful means.'" *Cherry*, 436 F.3d at 772 (emphasis in original) (quoting *United States v. Jones*, 72 F.3d 1324, 1334 (7th Cir. 1995)).

However, the government's argument fails for two reasons—one procedural and one substantive. First, the government's inevitable discovery argument is underdeveloped and conclusory, and so it is waived. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (underdeveloped arguments are waived). The government devotes no more than three sentences to its argument and does not cite any facts or authority to support its position. It is also well established that unsupported arguments are waived. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (collecting cases).

---

[9] Technically, the doctrine of inevitable discovery is not a defense that the search was *legal*, it is a defense that the evidence obtained from an *illegal* search should not result in suppression. *See United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006).

17

Second, even if the government survives *waiver*, it fails to meet its *burden* of showing that the firearms would have been discovered through lawful means. It only argues that a lawful inventory search would have occurred, but for reasons already explained, the officers did not conduct a lawful inventory search. It might be hypothesized that the contraband produced by Hawkins within 15 minutes of the search was the missing ingredient to the officers' recipe of probable cause, but the government does not make that argument, and such an argument would require the court to infer that Trooper Bean would have talked with Trooper Finney, or that the search could be saved by the officers' collective knowledge. The court is not required to speculate as to what would have naturally followed. *See United States v. Stotler*, 591 F.3d 935, 944 (7th Cir. 2010) (Sykes, J. dissenting). Accordingly, the government has failed to carry its burden of showing that the doctrine of inevitable discovery applies.

One final housekeeping matter: the government asserted in response to the first motion to suppress that Defendant lacked standing[10] to challenge the search. However, at the suppression hearing, the government retreated, stating that if the court found Defendant's testimony reliable—that Jackson permitted Defendant to use the vehicle—then he would have standing to pursue his claim. (Suppression Hrg. Tr. at 46:10 – 15). The court found Defendant credible as there was no competing evidence and accordingly,

---

[10] As the court explained in its first Entry, "standing" is technically a misnomer, *United States v. Figueroa-Espana*, 511 F.3d 696, 703 n. 1 (7th Cir. 2007), but both the court and the parties have acquiesced in this mislabeling for ease of reference. *See United States v. Crowder*, 588 F.3d 929, 934 n. 5 (7th Cir. 2009).

Defendant could assert a Fourth Amendment claim. (Filing No. 28, Entry on Motion to Suppress, at 4 – 5).

The testimony at trial showed Defendant was authorized to use the vehicle. (*See* Day 1 Tr. at 183:18 – 19) (Jackson testifying she and Defendant primarily used the vehicle). The government has not argued standing in its response to Defendant's second motion to suppress, and so the court has not further considered the merits, if any, of such a challenge. A party's failure to make an argument results in waiver, *see O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009)—a rule that applies equally to the government. *Stotler*, 591 F.3d at 944 (Sykes, J. dissenting).

## III. Conclusion

People have an expectation of privacy in their vehicles. The Supreme Court recently reinforced that the automobile exception to the warrant requirement, is just that—an exception. *Collins v. Virginia*, No. 16-1027, 2018 WL 2402551, at *7 (U.S. May 29, 2018). Here, the search of the vehicle was conducted without a warrant, probable cause, or adherence to standardized inventory procedures. While the cost of suppressing evidence of guilt is great, the cost of permitting unreasonable searches is greater. Since the search was conducted in violation of Defendant's Fourth Amendment rights, the firearms must be suppressed.

Accordingly, Defendant's second motion to suppress (Filing No. 52) is **GRANTED**.

**SO ORDERED** this 4th day of June 2018.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.